## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SARA CARPENTER,<br><br>　　　　　　　Defendant. | Crim. Action No. 1:21CR305 |

## MEMORANDUM IN AID OF SENTENCING

Sara Carpenter traveled from her home in Queens, New York, to attend the rally organized by the former president. She came to express her earnestly held belief that——as the president and other prominent leaders had been exhorting—the 2020 election was "stolen." Ms. Carpenter did not carry weapons of any kind with her to the Capitol. She dressed in plain clothes. While at the Capitol and inside, she did not engage in any violence or destruction of property. Instead, she shook a small tambourine. Ms. Carpenter was subsequently charged in a seven count Indictment, charging Civil Disorder, Obstruction of Justice, and various misdemeanor counts.

Following a three-day jury trial, Ms. Carpenter was convicted of all counts. She will be before the Court for sentencing on December 18, 2023.[1] Ms. Carpenter and counsel have reviewed the Pre-Sentence Report (PSR) and respectfully submit that

---

[1] Following trial, trial counsel moved to withdraw. Undersigned counsel from the Federal Public Defender for the District of Columbia (FPD) was appointed to represent Ms. Carpenter for the sentencing. FPD will represent Ms. Carpenter through the appeals phase.

the guideline range is excessive and Ms. Carpenter's conduct is nowhere near warranting the 66 month sentence the government requests.

With respect to the PSR's calculations, Ms. Carpenter offers the following objections:

*First*, the PSR is incorrect to apply the aggravated assault guideline, USSG § 2A2.4, because Ms. Carpenter did not assault an officer and even assuming *arguendo* that she did, she did not do so with an intent to commit another felony. The evidence at trial nowhere near supports the application of the aggravated assault guideline.

*Second*, the PSR is wrong to apply a one-level increase under § 3D1.4, because all of the counts group and no count involved a separate victim.

*Third*, the USSG § 2J1.2's "administration of justice" specific offense characteristics do not apply as a legal or factual matter.

*Fourth*, a 6-level "official victim" enhancement under USSG § 3A1.2 does not apply because there was no victim of an assault and even if there was a victim, the enhancement cannot apply under USSG § 2A2.4. Moreover, assuming *arguendo* that Ms. Carpenter did engage in assaultive conduct, that conduct was not motivated by anyone's status as a police officer.

*Fifth*, Ms. Carpenter qualifies for the "zero- point offender" two-level reduction under recently promulgated USSG § 4C1.1.

Therefore, Ms. Carpenter respectfully submits that the correctly-calculated offense level is 12, resulting in a guideline range of 10 to 16 months[2].

Counsel respectfully submits that application of the factors set forth in 18 U.S.C. § 3553(a) militates in favor of a sentence that recognizes that imprisonment is, at best, an imperfect sanction, especially for Ms. Carpenter, who has long struggled with mental health issues. Instead, a sentence of two years of probation with conditions, including mental health treatment, will fairly reflect Ms. Carpenter's lack of criminal history, her unlikelihood of recidivism, her compliance with supervision, and the non-violent nature of her offense conduct

### i.      Objections to the PSR's Guidelines Calculation

### 1. The aggravated assault guideline, USSG § 2A2.2, does not apply to any count.

The PSR is incorrect to apply the aggravated assault guideline to Count 1 (Civil Disorder) and Count 4 (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) by way of the cross-reference found in USSG § 2A2.4. Here, the PSR mischaracterizes the evidence, stating, "while shaking her tambourine, and with a mob at her back, defendant Carpenter taunted and tried to intimidate MPD officers by getting in their faces. . . Officers had to physically push defendant Carpenter back as she challenged their defense line, and at one point defendant Carpenter *slapped* the arm away of an officer with her tambourine" (emphasis added)." PSR ¶ 21. The PSR next concludes Ms. Carpenter used her tambourine to assault an officer and that

---

[2] Under §3D1.1(b), the counts group. Under the applicable guideline—2J1.2— the base offense level is 14. After a two-level reduction because Ms. Carpenter is a "zero-point offender," the offense level is 12.

the assault was committed during her intent to commit another felony, namely, the conduct in Count Two – Obstruction of an Official Proceeding." PSR fn4.

The PSR's characterization of the evidence is grossly exaggerated. The video evidence shows that Ms. Carpenter was part of a crowd squaring off with police officers. At times, she was shouting. At point, an officer tries to push Ms. Carpenter away and her arm involuntarily, reflexively jerks up. The video evidence does not show that she intentionally slapped an officer.[3] *See* Gov. Trial Exhibit 512.

Based on this mischaracterization of the facts, the PSR wrongly applies the aggravated assault guideline. This approach is incorrect. USSG § 2A2.4(c) requires a defendant convicted of assaulting a federal officer under 18 U.S.C. § 111 be sentenced under §2A2.2, only if the defendant's conduct constituted aggravated assault. The commentary to the aggravated assault guideline defines "aggravated assault" as

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony. Cmt. 1.

The PSR does not contend—nor could it—that subsections (A), (B), (C) apply. With respect to "intent to commit another felony," the evidence at trial nowhere near established that Ms. Carpenter assaulted an officer with an intent to commit another felony for the following reasons.

---

[3] For this reason, specific offense characteristic found in § 2A2.4 (b)(1)(A) "physical contact" also does not apply. *See United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000)(explaining that although no federal court has defined "physical contact" as used in [§ 2A2.4](b)(1)], the meaning can be derived by examining the law of battery. Battery is defined as "intentional and wrongful physical contact with a person.") (internal citations omitted).

First, Ms. Carpenter was not charged with, let alone convicted of, any assault. Moreover, the video evidence did not establish that Ms. Carpenter used her tambourine "to slap away" the officer's arm. *See* Gov. Trial Exh 512. Instead, the video shows that her armed jerked up slightly and involuntarily when an officer grabbed her arm.

Second, even assuming *arguendo* that Ms. Carpenter used her tambourine in the manner described in the PSR, it was not done "with an intent" to commit another felony. For purposes of USSG § 2A2.2, it is insufficient—as the PSR contends—that the conduct occurred *during* the commission of obstruction of justice. Rather, in order for 2A2.2 to apply, the alleged assaultive conduct must be conducted ***with an intent to commit another felony***. Again, the video evidence failed to establish that Ms. Carpenter intentionally assaulted an officer with her tambourine with the intent to obstruct the certification of the vote. Therefore § USSG 2A1.4 applies to Ms. Carpenter's conduct.

### 2. Count 1 groups with the other counts because Count 1 does not involve a different victim.

The PSR incorrectly applies a one-level increase under USSG § 3D1.4, contending that Count 1 (Civil Disorder and Aiding and Abetting) involved a different victim than the other counts. Count 1 broadly charges Ms. Carpenter with obstructing officers. There was no one individual "victim" identified in the charging documents or at trial. Therefore, all the counts group as "two or more acts connected by a common criminal scheme." USSG §3D1.2(b). Moreover, section 231(a)(3) "any act" that obstructs, impedes, or interferes with an officer performing lawful duties "incident to

and during the commission of a civil disorder." The acts are Ms. Carpenter's acts inside the capitol. The victims of the civil disorder were the group of officers Ms. Carpenter encountered. There is no specific, separate victim to the obstruction count. Count 1 therefore arises from the same specific acts, share the same victims, is temporally related, and therefore must be grouped pursuant to U.S.S.G. §3D1.2.

### 3. USSG§ 2J1.2 Specific Offense Characteristics, which result in an increase of a total 11-levels, do not apply as a legal or factual matter.

Ms. Carpenter objects to the application of the three-level enhancement under §2J1.2(b)(2) and the 8-level enhancement under § 2J1.2(b)(1)(B) because, as Judge McFadden found in another January 6 case, her offense did not involve the "administration of justice." *See United States v. Seefried*, 639 F. Supp.2d 8 (D.D.C. 2021). For the reasons set forth in Judge McFadden's opinion on this issue, which Ms. Carpenter adopts and incorporates here, the application of these enhancements is a legal error.

### a.     §2J1.2(b)(1)(B) does not apply factually.

The evidence at trial did not establish that Ms. Carpenter caused or threatened to cause physical injury to a person in order to obstruct the administration of justice. The evidence showed that Ms. Carpenter shook her tambourine and confronted officers.[4] However, she did not cause or threaten to cause physical injury to anyone. She never yelled threats to harm anyone. And again, the video evidence does not show that she "slapped" an officer's arm with a tambourine. Nor is there evidence that she

---

[4] *See e.g.*, Gov. Trial Ex. 512.

did any of the conduct described in the PSR "in order to obstruct the administration of justice." Therefore, this enhancement does not apply as a factual matter. *See* U.S.S.G. §2J1.2(b)(1)(B) ("If the offense involved causing or threatening to cause physical injury to a person, or property damage, ***in order to obstruct the administration of justice***, increase by 8 levels.") (emphasis added)

**b.    Nor does the "substantial interference" specific offense characteristic apply as a factual matter.**

The comments to the Guidelines addressed what constitutes a "substantial interference" with the administration of justice. Notably, each example in the commentary describes a situation in which the defendant materially affected the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 cmt. n. 1. Here, Ms. Carpenter's actions had no causal relationship with the outcome or duration of the joint session. She assaulted no one and she did not encounter legislators or staff. She did not step foot in the Senate Chamber when Congress was meeting or at all. Her conduct was similar to that of Class A and B misdemeanants who entered the building and engaged in disorderly conduct. There is no factual basis for calling Ms. Carpenter's conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.

Therefore, even setting aside the issue as to whether the conduct involved "administration of justice," the specific offense characteristics do not apply.

### 4.  A victim-related adjustment does not apply.

The PSR wrongly applies a 6-level increase "official victim" enhancement under USSG § 3A1.2. This does not apply for three reasons. First, there was no individual victim to any of Ms. Carpenter's offenses. Second, even if there were, any arguable assaultive conduct was not motivated by anyone's status as a police officer. Third, if the most analogous guideline for the Civil Disorder count is §2A2.4. Pursuant to 2A2.4 cmt. 2, the "official victim" adjustment is improper because the guideline already takes into account the victim's status.[5]

### 5.  Ms. Carpenter qualifies for the two-level zero-point offender reduction.

Ms. Carpenter has zero criminal history points and therefore qualifies for a two-level adjustment under USSG § 4C1.1. The Commission promulgated the Zero-Point Offender provision in recognition of the low recidivism rates of first-time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." Amendments to Sentencing Guidelines (April 27, 2023) at 78-80. Ms. Carpenter is exactly the type of offender the Commission had in mind when it promulgated this guideline. Contrary to the government's hyperbolic characterization of the facts, her offense did not involve violence and there is no evidence that Ms. Carpenter is likely to recidivate.

---

[5] *U.S. v. Jennings*, 991 F.2d 725 (11th Cir. 1993).

## II. The Sentencing Factors Support a Probationary Sentence

### i.     *Ms. Carpenter's early childhood in Queens.*

Sara Carpenter was born in the Richmond Hill neighborhood of Queens, New York. She is the oldest of five children. Her parents were both teachers. She has four siblings. Ms. Carpenter was raised in the same middle class Queens neighborhood in which she now lives. According to Ms. Carpenter, she had a "typical" upbringing. In conversations with counsel, however, she has referenced a history of abuse but declined to elaborate. Ms. Carpenter's New York Police Department (NYPD) records document that she once reported to a therapist that when she was young she was "sorrowful and cried all the time."[6]

After graduating from Catholic high school, Ms. Carpenter attended Marymount Manhattan College where she studied her passion--art. After college, she worked as a flight attendant for a few months before joining the NYPD in 2000.

### ii.     *Ms. Carpenter was a first responder on September 11, 2001.*

Ms. Carpenter was serving at a police officer on September 11, 2001. She was off duty that day but as soon as she heard the sirens and saw the smoke, she rushed from her home in Queens to her assigned precinct by Central Park. From there, she responded directly to the twin towers area, which she vividly described as like "being in a blizzard" of brown dust. She managed to pull one woman from the rubble, likely saving her life. After bringing the woman to safety, she helped to create a path to the Mount Sinai Beth Israel hospital. She then went back into the rubble to assist with

---

[6] Recommendation for examination by Article II Medical Board, July 21, 2003.

search and rescue. Ms. Carpenter becomes visibly upset when she recalls that terrible day and the aftermath. This reaction to recalling the event twenty years later is understandable: Many of her friends and loved ones, including her former training captain and her brother-in-law, were killed on September 11.

In the days and months after September 11, Ms. Carpenter felt overwhelmed, unable to manage. She could not stop crying. NYPD records reflect that her colleagues reported that she would frequently burst into tears on the job. It soon became clear that she could no longer handle the stress of being a police officer. Her NYPD records show that she received psychotherapy for depression. In 2003, she was evaluated by a psychologist and diagnosed with Post-Traumatic Stress Syndrome and Major Depression.[7] She was subsequently deemed unable to work due to her Major Depressive Disorder and was approved to receive disability retirement.[8] In 2012, she was evaluated again and diagnosed with severe clinical anxiety, posttraumatic distress disorder, and depression.[9] After she left the police department, Ms. Carpenter's mental health slowly improved. She focused on her art and volunteered at her local parish.

In 2003, Ms. Carpenter became pregnant, the result of a short relationship. Her son Luke was born on October 19, 2003. Ms. Carpenter threw herself into raising

---

[7] Letter of Dr. Robert Gordon, PSy.D., Licensed Psychologist, Clinical Assistant Professor, NYU School of Medicine, January 3, 2003.

[8] NYPD records reflect that the NYPD Medical Board recommended approval for "Ordinary Disability Retirement," which is retirement not based on workplace injury or accident.

[9] Report of Dr. Mary Macednoio, PSy.D, March 31, 2012.

Luke. In 2007, the Queens Family Court awarded her full custody following a years-long contentious custody battle. Ms. Carpenter raised Luke on her own, with the occasional help of her parents who live nearby. She and Luke enjoy a stable, loving relationship. Luke is currently a freshman at Iona University.

### iii.    *Ms. Carpenter's art has been a therapeutic outlet for her.*

Ms. Carpenter is a talented artist. After retiring from the police department, she devoted much of her time to painting and sculpture and occasionally sold her works at local art fairs and exhibits. She also served as a volunteer art teacher, teaching 3D art to children at a local elementary school. Below are examples of Ms. Carpenter's paintings. She displayed one of her paintings of the twin towers at a park in Queens, where passersby would stop to admire it:



Another of her paintings was displayed in her church:



### iv.  *The COVID-19 pandemic exacerbated Ms. Carpenter's mental health struggles.*

Prior to the pandemic, despite her mental health issues, Ms. Carpenter had achieved a stable life: she raised her son on her own, she volunteer taught elementary school children, she worked in a neighborhood deli for extra income, and she attended mass and other gatherings at her local parish. The web of supports that Ms. Carpenter had woven together following 9/11 unraveled when the COVID- 19 pandemic hit New York City with gale force. Stores, restaurants, churches, and schools shuttered. The community upon which Ms. Carpenter relied was suddenly gone. She lost her job at the deli. Her parish stopped holding mass. She could no longer teach art. She could not visit her elderly parents. Because Ms. Carpenter objected to wearing a mask, she lost touch with many friends and was not able to attend Thanksgiving dinner with her family. Isolated from her usual support network, she found solace corresponding with others online, where she found others

who shared her protest over mask mandates and other pandemic restrictions. She also closely followed the former president, who, after the election, was telling his followers that the election had been "stolen."

> **v.   *The nature and circumstances of Ms. Carpenter's conduct on January 6 were spontaneous and nonviolent.***

A couple days before January 6, a friend with whom Ms. Carpenter had connected online invited her to go the former president's "Stop the Steal" rally. Initially, she declined the invitation. But when the man insisted, she decided to attend. She booked an Airbnb for herself and drove down to the district alone. The tambourine was the only item she carried with her to the Capitol.

Once on the grounds, Ms. Carpenter joined the crowds physically and emotionally. Having been alone for months on end, suddenly being amidst a large crowd overwhelmed and excited her. She followed the crowd into the building through the upper west terrace doors, which at the point she entered, were open. The scene inside the Capitol was chaotic and stressful for Ms. Carpenter. When she was standing in a line of protestors facing police officers, a police officer attempted to grab her and she instinctively jerked her arm back. It was a reflexive, involuntary, and slight action. The PSR has characterized this action as an assault with an intent to commit another felony. It was no such thing. Instead, it was a brief reaction to a perceived threat.[10]

---

[10] Ms. Carpenter does not contend that the officers did anything wrong. Here, counsel focuses on Ms. Carpenter's state of mind at the time she encountered police officers in the Capitol.

The Court is familiar with the evidence having presided over the trial. The video evidence showed that Ms. Carpenter entered the Capitol, shook her tambourine, and briefly shouted towards officers. The evidence did not establish that she physically assaulted any officer, let alone assault an officer with the intent to commit another felony. She did not threaten bodily injury or destroy property. *See supra*, objections to PSR. She did not enter any sensitive spaces within the Capitol. When she returned home, she did not boast about or otherwise glorify what happened at the Capitol. Her conduct was not significantly worse than dozens of January 6 defendants convicted under Section 1752. And yet, the guideline range identified in the PSR and the sentence requested by the government reflects the type of sentence one might expect for seriously assaulting and injuring an officer.

### vi.   A probationary sentence, with continuing conditions, will achieve the goals of sentencing.

### a. The severe collateral consequences that attach to Ms. Carpenter's convictions, along with a sentence of continuing conditions, constitute a just punishment and adequate deterrence.

Unfortunately, the government appears to reflexively request staggeringly draconian prison sentences for January 6 defendants convicted of obstruction, without regard for the 3553 factors that the Court must consider and alternatives to incarceration for first offenders like Ms. Carpenter. The Supreme Court has recognized that continuing supervision is also a punishment. A sentence of continuing supervision is hardly a free pass. *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's liberty and constitutes punishment, not a "free pass"). Restitution, especially for

someone with Ms. Carpenter's means is also a punishment. *United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal defendant's sentence."). Moreover, Ms. Carpenter will experience long-lasting consequences for her felony conviction, which cannot be overstated. District judges have recognized the life-long, damaging impact of a felony conviction can be relevant to sentencing. For example, in another January 6 case, the Honorable Amit P. Mehta observed

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.[11]

Similarly, in imposing a variant probationary sentence, Judge Frederic Block of the Eastern District of New York issued a written opinion on the relevance of collateral consequences to his sentencing determination and urged that judges "consider such consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F. Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful function other than to further punish criminal defendants after they have completed their court-imposed sentences. Many—under both federal and state law—attach automatically upon a defendant's conviction. The effects of these collateral consequences can be devastating. … Myriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These

---

[11] *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29.

restrictions amount to a form of civil death and send the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 *(*internal quotations, alterations, and citations omitted*)*. In *Nesbeth*, the defendant was also a first offender, convicted of importation of drugs. Though that defendant's guideline range was 33-41 months, Judge Block "rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180.

The collateral consequences that Ms. Carpenter has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment" and "adequate deterrence." News of her arrest and trial were publicized in her community. As a result of her arrest, she was told that she can no longer volunteer to teach children art. She felt ostracized from her parish community. These may seem like minor consequences to someone else, but to Ms. Carpenter, a fragile woman who relied on teaching and church as emotional outlets, the rebuffs have been particularly painful and embarrassing.

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of

punishments do not yield significant (if any) marginal deterrent effects."[12] In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Ms. Carpenter or others from committing this offense.

Finally, locking up a lonely, fragile, middle-aged woman for traveling to the Capitol alone at the invitation of the president—especially while the powerful organizers of the rally remain in positions of power and influence—will do nothing to prevent political violence should Mr. Trump (or anyone else) decide to rally and enflame his supporters once more. Instead, the government's categorically draconian, excessive sentencing requests in January 6 cases only serves to cement an impression that January 6 defendants are being treated unfairly vis a vis other defendants

---

[12] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation.  Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

charged following political protests, which in turn, undermines respect for the law rather than promoting it.[13]

### vii.   Probation with home incarceration will avoid unwarranted disparities.

Of course, no two cases—even among those that arise from January 6—are identical. Counsel could parse through every case and find similarities and differences between Ms. Carpenter's conduct and others on Jan 6. Like many Jan 6 defendants, she was encouraged by the former president's words and moved by the crowd. Like hundreds of others, she entered the Capitol building and encountered police officers. But unlike many, Ms. Carpenter did not injure or attempt to injure anyone or carry weapons. She was not among the first to breach a door or a window. She did not push past a line of officers. She is not and was not affiliated with an extremist organization. To the contrary, even prior to the pandemic, she lived a fairly isolated life and had few, but important connections through church and her volunteer work. She came to the Capitol in an even more fragile state than usual following months of isolation from her support network. The sentences imposed in the following cases show that the defense request would be consistent with sentences imposed in other cases in which defendants were convicted under Section 1512, but

---

[13] Colleen Long and Michael Kunzelman, *Judge questions whether Jan. 6 rioters are treated unfairly*, AP, October 21, (2021) (reporting that a district judge suggested that the Justice Department was being too hard on those who broke into the Capitol compared to people arrested during anti-racism protests following George Floyd's murder).

whose cases presented mitigating circumstances like the ones presented in Ms. Carpenter's case.

### i. United States v. Wood

In *United States v. Wood*, 1:21CR223 (APM) the defendant was convicted of all charges in the Indictment of which the lead charge was 18 U.S.C. § 1512(c)(1). The PSR also applied the 8 and 3-level enhancements under U.S.S.G. §2J1.2(b)(1)(B) and §(b)(2), respectively.[14] The government requested a sentence of 57 months based on its guidelines calculation of 51 to 63 months. Judge Mehta declined to apply the eight-level enhancement under Section 2J1.2(b)(2) despite evidence that Wood boasted about fighting police and "storming" the Capitol in messages to others such as: "We sent congress running into their escape tunnels," and "We just stormed the Capitol, we are busting into house chambers," "We busted the windows out." Wood also messaged a friend, "I am fighting capitol police." According to the government, Wood climbed scaffolding, waved other protestors forward, and entered through a broken window. He was also part of a group that "terrorized" staffers present in House Speaker's suite of offices."[15] Ultimately, recognizing that Mr. Wood had mental health issues, Judge Mehta imposed a sentence of one year of home detention.

### ii. United States v. William Isaacs, 21CR028 (APM)

---

[14] *United States v. Wood*, 1:23CR233, Gov. Sentencing Memo, ECF. No. 55 at 47.

[15] *United States v. Wood*, 1:23CR233, Gov. Sentencing Memo, ECF. No. 55 at 51.

William Isaacs, one of the Oathkeeper defendants, was found guilty following a jury trial on six counts, including obstruction of justice. *See United States v. William Isaacs*, 21-cr-028 (APM). Mr. Isaacs was accused of participating in the efforts of the Oathkeepers prior to and on the day of January 6, 2021. Leading up to January 6, he sent messages conveying his intent was either that "Trump cross the Rubicon or the citizens cross the Delaware," and that "We should attack [Mayor Bowser] upon arrival." {CITE} On January 6, 2021, Mr. Isaacs went into the Capitol building and proceeded to the Senate Hallway where he yelled, "the fight is not over!." Following January 6, 2021, Mr. Isaacs took steps to delete evidence of his involvement. Recognizing his youth and diagnosis of autism, the Court rejected the government's request of 131 months incarceration and imposed five years' probation.

### iii. *United States v. Rafael Rondon and Maryann Mooney-Rondon*, 21CR722-JMC

Rafael Rondon and his mother, Maryann Rondon breached the Senate Wing Door ten minutes after it was breached by rioters. They traveled together to the Speaker's suite where they encouraged and assisted man in stealing a laptop from the office. After stealing the laptop from the Speaker's office, they went to the Senate Gallery and stole escape hoods. When FBI agents later searched their home they discovered several firearms. Ms. Rooney admitted that she knew Congress was in session and certifying the results of the 2020 election when they entered the Capitol. The government requested a sentence of 51 months.[16] Judge Cobb declined to apply the

---

[16] *United States v. Rondon*, 1:21CR722, JMC, Gov. Sentencing Memo, ECF. No. 67

8-level enhancement under USSG 2J1.2(b)(1)(B) and imposed probation sentences for both defendants, with a condition of significant periods of home incarceration. These cases show that a sentence that reflects Ms. Carpenter's fragility as well as the non-violent nature of her conduct would not be entirely out of step with sentences imposed in other cases involving convictions for obstruction of justice.

Meanwhile, the cases the government cites in its memo are inapposite. Gov. Memo at 30, 31. In *United States v. Anthony Williams*, for example, the defendant was one of the first rioters to enter the building and physically pushed past police officers numerous times. Next, the government refers to *United States v. Joshua Douglas Wright*, but the docket number provided is connected to *United States v. Pruitt*, a case involving an individual who pre-planned violence with the Proud Boys who wore combat gear to the rally. Finally, the government points to *United States v. Egtvedt*, 21CR177. That case is also factually dissimilar in significant respects not the least of which is Engtvedt physically pushed officers, causing injury to one officer.

Ms. Carpenter did not physically shove her way past officers. She did not injure anyone or pre-plain violence. The video evidence shows that she shouted towards officers. While what she was yelled was regrettable ("I am a fucking animal"), she did not seriously threaten physical violence. That she has never engaged in violence in any other context shows that her exaggerated behavior was not the result of a violent intent. Instead, it is clear that some of her conduct can be attributed to her documented mental health diagnoses.

## Conclusion

Ms. Carpenter is, at her core, a fragile woman who, after months of isolation during the pandemic, became carried away by the large crowd. She did not intend to cause nor did she cause violence or destruction on January 6. While the record as a whole suggest that she is in need of additional mental health treatment, it in no way suggests that a sentence of imprisonment is warranted. Instead, a sentence that includes continued supervision and therapy is sufficient but no greater than necessary to achieve the goals of sentencing.

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500